UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 4:23CR95 RLW(SPM) |
| RANDY WILKES, | ) ) ) |
| Defendant. | ) ) |

# REPORT AND RECOMMENDATION
# AND MEMORANDUM OPINION
# OF UNITED STATES MAGISTRATE JUDGE

All pretrial matters have been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Defendant Randy Wilkes ("Defendant" or "Wilkes") is charged in an indictment with being a felon in possession of a firearm on October 5, 2022. The charge stems from the execution of a state felony arrest warrant for Wilkes at a residence in St. Louis County on October 5, 2022. While officers were inside the residence searching for Wilkes, a member of the arrest team seized a .45 caliber firearm from a bag hanging on the back of a door in the primary bedroom of the home. Wilkes has filed a motion to suppress the firearm contending it was the fruit of an unconstitutional search and seizure. ECF No. 38 & 55. The United States has responded to the motion arguing seizure of the firearm did not violate the Fourth Amendment because it was in plain view and the officer who seized it was lawfully in the bedroom when he saw the firearm. ECF No. 46 & 59.

The undersigned held an evidentiary hearing on April 9, 2024. The United States offered testimony of St. Louis County Police Department (SLCPD) Officer Terence Monroe and Deputy United States Marshal Jaime Monsalvo. The United States also offered bodycam video footage

from four St. Louis County officers who participated in the execution of the arrest warrant on October 5th.[1] Govt. Exhs. 2-5. Wilkes cross-examined the United States' witnesses but offered no additional evidence.  At the conclusion of the hearing, the court heard argument from counsel and the parties were granted time to file post-hearing briefs.  Post-hearing briefing concluded on June 4, 2024, and the matter is now ready for ruling.

After carefully considering the evidence of record, applicable case law, and the arguments of the parties, for the reasons discussed below I find that Wilkes' motion to suppress should be denied.

## FINDINGS OF FACT

In September 2022, Sergeant Terence Monroe was a ten-year veteran police officer with the St. Louis County Police Department ("SLCPD") and was also cross designated as a Task Force Officer ("TFO") with the United States Marshal Service. As a TFO with the United States Marshal Service, Sergeant Monroe's duties included locating and apprehending state and federal level fugitives with warrants for their arrest. In September of 2022, Sergeant Monroe was assigned the task of assisting the Ferguson, Missouri Police Department in locating and apprehending Randy Wilkes who had St. Louis County warrants for felony domestic assaults.

As part of his fugitive investigation, Sergeant Monroe did a record check using various law enforcement databases and platforms. Sergeant Monroe also spoke with the case detective, reviewed a report of the incident that led to the arrest warrant, and spoke with the victim of the domestic assault incident. Based on his investigation Sergeant Monroe learned that Wilkes was a previously convicted felon who was barred from possessing firearm. Sergeant Monroe also confirmed the warrants for Wilkes' arrest were for second degree domestic assault, armed career

---

[1] The videos were labeled Borzillo, Monroe, O'Brien, and O'Fallon.

criminal, and kidnapping; that Wilkes might be in possession of and operating a Doge Magnum; that Wilkes might be in possession of two firearms, one of which was an assault rifle; and that Wilkes might be living with an intimate partner at 10432 Gardo Court in Bellefontaine Neighbors. Two days before attempting to execute the arrest warrant, Sergeant Monroe conducted surveillance of the residence on Gardo Court. Consistent with what he learned from his investigation, Sergeant Monroe observed a Dodge Magnum in the driveway and observed Wilkes taking out the trash and returning to the residence.

      On October 5, 2022, approximately twelve to fifteen officers from the St. Louis County Police Department and the United States Marshal Service responded to the Gardo Court residence to arrest Wilkes. Before attempting the arrest of Wilkes, Sergeant Monroe briefed the arrest team on the information he had gathered about Wilkes, including his criminal history and the fact that he was potentially armed with one or more firearms. After some members of the arrest team formed a perimeter around the house, Sergeant Moore and other officers knocked and announced themselves as law enforcement. They also announced that they had an arrest warrant for Wilkes and that he should come out of the residence.

      After waiting for several minutes, the officers breached the front door to the residence. Four minors emerged from the house and, in response to questions by the officers, they confirmed that Wilkes was inside the residence and had gone to the basement upon hearing the officers knock and announce. The arrest team then used a remote-control robot equipped with a camera to enter the home to locate Wilkes on the main floor of the house. After unsuccessfully trying for thirty minutes to locate Wilkes using the robot, the arrest team announced that they would use a police K-9 unit to locate Wilkes inside the home if he did not come out, to no avail. When Wilkes did not emerge from the house, the arrest team released the police K-9 into the

3

residence and then officers followed the K-9 into the residence to conduct a room-by-room search for Wilkes.

Once in the house, members of the arrest team first determined Wilkes was not in the living room. Next, they proceeded down a hallway toward three bedrooms: one primary and two secondary bedrooms. Sergeant Monroe, along with Officers O'Brien, O'Fallon, and Borzillo, entered the primary bedroom after the police K-9 while other members of the arrest team, including Deputy Monsalvo, remained in the hallway. According to Sergeant Monroe, members of the arrest team looked for Wilkes "in any place that a human body can fit," including inside closets, underneath beds, and behind doors. ECF No. 51 (Hrng. Tr.), at p. 25. During their initial search of the bedrooms, the officers discovered an empty rifle case underneath a mattress. This discovery heightened the arrest team's concern for their safety.

The arrest team then searched the second and third bedrooms but did not locate Wilkes. Several members of the arrest team remained in the hallway near the three bedrooms while Sergeant Monroe determined how best to search for Wilkes in the basement. At this point, Deputy Monsalvo, who was not involved in the first search of the primary bedroom, entered the primary bedroom and, using the flashlight attached to his rifle, looked in closets, behind furniture and behind doors. When Deputy Monsalvo looked behind a door to the *en suite* bathroom, he noticed a black satchel hanging on the doorknob. Deputy Monsalvo's attention was drawn to the satchel because it felt heavy when it hit against the door. As he shined his flashlight on the satchel, he saw the grip of a handgun sticking out from the satchel. He then removed the handgun, unloaded it, and secured it in the dump pouch attached to his duty belt. He did not locate Wilkes in the primary bedroom.

The arrest team deployed pepper balls into the basement, to no avail, and, ultimately, deployed an OC vapor grenade (which has the effects of pepper spray) which caused Wilkes to start coughing, allowing the arrest team to locate and apprehend Wilkes who had been hiding in a little cubby area underneath the basement staircase.

Sergeant Monroe and Deputy Monsalvo were both credible witnesses. There was nothing about either witness's demeanor in responding to questions that appeared to be intentionally misleading, evasive, or suggestive of an attempt to be less than candid with the Court. Moreover, the testimony of both Sergeant Monroe and Deputy Monsalvo was partially corroborated by the body-worn camera footage submitted by the United States. *See* Govt. Exhs. 2-5.

## **CONCLUSIONS OF LAW**

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In general, searches and seizures are unreasonable and invalid unless they are based on probable cause and executed pursuant to a warrant. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (A warrantless search or seizure is unreasonable unless a recognized exception applies); *Katz v. United States,* 389 U.S. 347, 357 (1967) (the Fourth Amendment imposes a presumptive warrant requirement for searches and seizures). The seizure of items in plain view is a well-established exception to the Fourth Amendment's probable cause and warrant requirements. *Coolidge v. New Hampshire,* 403 U.S. 443, 465 (1971) ("It is well established that under certain circumstances the police may seize evidence in plain view without a warrant."). "The plain view exception allows an officer to seize an object without a warrant if '(1) the officer lawfully arrived at the location from which he or she views the object, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself.'" *United States v. Saddler*, 19 F.4th 1035, 1041-42 (8th Cir. 2021) (quoting *United States v. Arredondo*,

5

996 F.3d 903, 907 (8th Cir. 2021)). For the reasons discussed below, all three requirements of the plain view exception are met in this case.

    A.    ***Deputy Monsalvo was lawfully in the primary bedroom when he viewed the firearm***.

As the foregoing factual findings demonstrate, Deputy Monsalvo and the rest of the arrest team entered the residence to conduct a room-by-room search for Wilkes because they had a felony arrest warrant for Wilkes, and because they believed Wilkes was hiding inside the home and was possibly armed. The Fourth Amendment does not prevent law enforcement officers from entering a home to execute an arrest warrant if they "have a *reasonable belief* that the suspect resides at the place to be entered and have reason to believe that the suspect is present at the time the warrant is executed." *United States v. Glover*, 746 F.3d 369, 373 (8th Cir. 2014) (emphasis in original) (quoting *United States v. Powell*, 379 F.3d 520, 523 (8th Cir. 2004)). The "reasonable belief" determination considers everything the officers know at the time they decide to enter the home. *Id.* (citing *United States v. Junkman*, 160 F.3d 1191, 1193 (8th Cir. 1998)).

Here, the arrest team had learned more than enough information to support their belief that Wilkes lived at 10432 Gardo Court and was inside the home the morning of October 5, 2022. Based on his investigation, Sergeant Monroe learned that Wilkes was likely living at the Gardo Court address with an intimate partner. Sergeant Monroe was able to corroborate that information by conducting physical surveillance before attempting to arrest Wilkes at the Gardo Court residence. Specifically, Sergeant Monroe observed a car that Wilkes reportedly drove in the driveway of the residence and, two days before the arrest, Sergeant Monroe saw Wilkes at the residence. At the time, Wilkes was taking out the trash—in other words, Sergeant Monroe observed Wilkes doing an activity typically done by someone who lives in a home. On the morning officers executed the arrest warrant, the information gathered by Sergeant Monroe was

6

further corroborated when minors who exited the house told the arrest team Wilkes was inside and had gone into the basement after the officers knocked and announced their presence. Given these facts, it was reasonable for the arrest team to believe Wilkes was present inside the residence. Therefore, it was lawful for the arrest team to enter the home to search for and apprehend Wilkes.

Wilkes does not appear to dispute that the arrest team lawfully entered 10432 Gardo Court to execute the arrest warrant. See ECF No. 55, p. 2. Instead, he argues that because other members of the arrest team had already searched the primary bedroom, Deputy Monsalvo violated the Fourth Amendment when he entered the primary bedroom to conduct a secondary search for Wilkes. In making this argument, Wilkes attempts to graft limitations inherent in the ***protective sweep*** exception to the warrant requirement onto the ***plain view*** exception. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *United States v. Alatorre*, 863 F.3d 810, 813 (8th Cir. 2017) (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). The protective sweep exception allows officers who have already arrested a subject to make a "cursory visual inspection of those places in which a person might be hiding" to ensure that there is no "threat of accomplices launching a surprise attack." *Id.*

This case is unlike a scenario in which the protective sweep exception and its related limitations might apply. In this case, although there is evidence that the arresting officers had reasons to be concerned about their safety, Wilkes—the subject of the arrest warrant—had not been arrested. The arrest team was actively searching for Wilkes in the home when Deputy Monsalvo saw the firearm inside an open satchel in the primary bedroom. As such, the critical question is whether Deputy Monsalvo was lawfully in the primary bedroom when he observed

7

the firearm inside the satchel. Wilkes' response to this critical question appears to be that it was unreasonable (and therefore unlawful) for Deputy Monsalvo to conduct a secondary search of the primary bedroom after it had already been searched and cleared by other members of the arrest team.

Although Wilkes offered no authority in support of his argument, the Supreme Court has held that "[t]he general touchstone of reasonableness which governs Fourth Amendment analysis [also] governs the method of execution of [a] warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[T]he 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out.") (emphasis in original). In all cases, then, "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Dalia v. United States*, 441 U.S. 238, 258 (1979).

In conducting a reasonableness review under the Fourth Amendment, courts "balanc[e] the extent of the intrusion against the need for it" and ultimately determine "whether the totality of the circumstances justified [the] particular sort of search or seizure." *Tennessee v. Garner*, 471 U.S. 1, 7-9 (1985). In deciding whether the totality-of-the-circumstances justified the manner in which a particular search or seizure was conducted courts have considered factors such as the presence of any threat to the officers; whether the suspect is known to be violent or dangerous; the crime under investigation—to the extent it indicates either that the suspect poses a safety risk or that the suspect could quickly dispose of evidence; whether the suspect posed a flight risk; and the amount of time officers waited before committing a forcible entry. *See Muehler v. Mena*, 544 U.S. 93, 99-100 (2005); *United States v. Banks*, 540 U.S. 31, 38 (2003); *Ramirez*, 523 U.S. at 71; *Graham*, 490 U.S. at 396; *Baker v. Monroe Township*, 50 F.3d 1186, 1192-94 (3d Cir. 1995).

In balancing the extent of the intrusion in this case against the need for it given the totality of the circumstances, this Court finds it was not unreasonable for Deputy Monsalvo to conduct a secondary search of the primary bedroom for Wilkes. When Deputy Monsalvo conducted a second search of the primary bedroom, the arrest team had already entered the residence and started their room-by-room search. They encountered no occupants during their search and there is no evidence that Deputy Monsalvo expanded the parameters of the search for Wilkes by, for example, looking in small spaces where there was no possibility a human body could be hidden. As such, Deputy Monsalvo's second search of the bedroom posed no greater intrusion than what had already occurred upon the arrest team's initial entry into the home. On the other hand, the necessity of a second search at a time when Wilkes was still concealed somewhere in the home seems obvious given the totality of the circumstances.

The arrest team knew that Wilkes was potentially armed with a handgun and an assault rifle. The team knew Wilkes was wanted for a violent crime and knew from the minors who exited the home that Wilkes was in the home. The officers knew that when they knocked and announced their presence, Wilkes had concealed himself somewhere in the home and they had been unable to locate him even though they used a robot equipped with a camera and a K9 police dog before conducting a room-by-room search for Wilkes. The team had grown more concerned for their safety when they discovered an empty rifle case under a mattress—but did not locate Wilkes. Until Wilkes was located and apprehended, any concern the officers may have had that they could be ambushed by Wilkes and potentially others who may have been hiding in the home was reasonable.

After team members completed their initial search of the three bedrooms, they briefly paused the search to contemplate next steps. Officers can be heard on the body camera video

footage discussing the possibility that there may be an attic or crawlspace, and officers can be seen on video going back into the bedrooms to look at the ceilings in closets, presumably to search for an entrance to a crawl space. It appears to have been at this juncture (between the initial unsuccessful search of the bedrooms and attempts to use other tactics to force Wilkes out of hiding) that Deputy Monsalvo went into the primary bedroom to conduct a second search for Wilkes. As Deputy Monsalvo explained during cross examination, he conducted the second search of the primary bedroom because "There was still concern that the defendant could have still been in there." ECF No. 51 (Hrng. Tr.), at p. 75.

In sum, the first prong of the plain view analysis is satisfied because Deputy Monsalvo was lawfully in the primary bedroom continuing to search for Wilkes when he saw the gun.

### B.   *The firearm's incriminating character was immediately apparent*.

Based on the factual findings, before the arrest team entered the Gardo Court residence Sergeant Monroe briefed the arrest team about Wilkes, including his criminal history and that he was potentially armed with two firearms. As such, Deputy Monsalvo was aware that Wilkes was a convicted felon who was prohibited from possessing a firearm and was aware that Wilkes may be in possession of a handgun and an assault style rifle. Considering what Deputy Monsalvo knew about Wilkes, the incriminating nature of the firearm was immediately apparent when he, first, heard a thud then saw the grip of the gun sticking out of a bag hanging on a door in the primary bedroom. *See United States v. Nichols*, 344 F.3d 793, 799 (8th Cir. 2003) (where officer is "aware of [Defendant's] prior criminal record" the incriminating nature of the firearm was immediately apparent); *United States v. Juneau*, 73 F.4th 607, 617 (8th Cir. 2023) (holding that the illegal nature of a firearm was immediately apparent because officers knew of the defendant's status as a felon).

Wilkes does not directly dispute the incriminating character of the gun would have been immediately apparent to Deputy Monsalvo given the evidence of record. Instead, he argues the firearm was not in plain view because it was inside a satchel behind a door and because it strains credulity to believe other members of the arrest team missed seeing the grip end of a gun sticking out of a bag in the primary bedroom. Accepting this argument would require the Court to discredit the testimony of Deputy Monsalvo. The Court declines to do so. Deputy Monsalvo credibly testified that when he moved the *en suite* bathroom door to look behind it, his attention was drawn to the satchel because it sounded heavy when it banged against the door. Deputy Monsalvo then shined his flashlight onto the satchel and saw that it was open and saw what appeared to be the butt of a gun sticking out of the bag.

The body camera video submitted by the United States only bolsters Deputy Monsalvo's testimony. The video shows that the rooms were dark and small and were crowded with multiple officers during the initial search for Wilkes in the primary bedroom. Based on the body camera video footage it is entirely plausible and even likely that given the circumstances the other members of the arrest team did not observe the satchel and gun later discovered by Deputy Monsalvo.

### C. *Deputy Monsalvo had a lawful right to seize the gun as evidence of a crime.*

As discussed above, Deputy Monsalvo was aware of Wilkes' criminal history and aware of the possibility that he was armed with both a handgun and assault style rifle. As such, once he saw the gun, Deputy Monsalvo had probable cause to believe the gun was contraband or evidence of a crime. Therefore, he properly seized the gun under the plain view exception to the warrant requirement. *See Saddler*, 19 F.4th at 1042-43.

Accordingly,

11

**IT IS HEREBY RECOMMENDED** that Defendant's motion to suppress evidence (ECF No. 38) be **DENIED**.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be set by separate order.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated: July 8, 2024.